May it please the Court, Katherine Tassinari for the appellant, Carol Pickett. Carol Pickett, at the time of the hearing, was 53 years old. She had never lived alone. She had never worked full-time. She had no friends. She received benefits in the 1970s for schizophrenia, and this embarrassed her, and she gave them back, and she stopped receiving benefits. That's what her mother's statement tells us. If she were here, she would tell you that she did an excellent job as a janitor for the church. However, we have a different version of her performance. We have Rev. Ettinger's two-page letter describing the situation in which Carol Pickett worked as a janitor. She described a protected, tolerant work situation. She said that the church hired people who couldn't find work, who couldn't get work elsewhere, and they worked with her because they were interested in seeing her succeed. Rev. Ettinger described two problems with my client's ability to work in terms of mental work. They didn't have any trouble with her physical performance. The problem was she actually worked excessively. A one-hour job cleaning a floor after a Girl Scout gathering, she took six hours to clean the floor, and they couldn't pay her hourly because she was so obsessive about these things. And she would become very anxious when supervised and didn't respond appropriately. But even more than that, she built up irrational resentments against the people in the church who used the building. And the example of the Girl Scout situation, I'm talking about transcript 161 and 162. She talks about the Girl Scouts coming, and my client was so upset afterwards that during this six-hour procedure where she's cleaning the floor, she calls the minister at least four times to complain about it. What Rev. Ettinger says is she couldn't imagine that an employer in a competitive workplace would be able to give Carol Pickett what she needs in terms of supervision and calming her down and so forth. I think that the minister's letter is very consistent with Dr. Hadley's letter on page 338 of the transcript. If you see what the minister said in terms of the Girl Scout situation and see what Dr. Hadley said, it's very highly consistent. So we not only have the treating psychologist identifying disabling limitations, we also have the minister. I'm trying to get the thrust of the argument. You've referred to evidence supportive of the claim, but what is the error that is being complained of? There must have been – was there not evidence the other way? Actually, there is no other treating evidence that went the other way. Strike treating. Excuse me. Okay, there was a doctor who did prescribe – Dr. Lichter prescribed some psychological medication, and he described her as improving in October of 2001. However, assuming we say that 2001, there was some improvement, which Dr. Hadley – this was not consistent with Dr. Hadley's March 2002 letter, but assuming for the sake of argument there was improvement, she still had over a year, probably a year and a half of time when she was not disabled. But to get to your question, Your Honor, there are two arguments. One, that the ALJ did not give clear and convincing reasons for rejecting the treating psychologist, and two, that the ALJ did not properly credit the lay witness evidence. Unfortunately, the agency doctors never saw Reverend Ettinger's letter, so we don't actually have an agency opinion that considered that. When you say the ALJ didn't properly credit the lay, you're talking about the character of the assessment or didn't or what? Okay. Well, I know what you're – when we have lay evidence, certainly Reverend Ettinger's comment that she couldn't be employable in a competitive workplace, I would say the ALJ can choose to accept or reject that. But what the ALJ did not reject was the descriptions that the minister gave of the difficulties that this woman has working, and we can translate those into some real limitations that are highly consistent with what the treating psychologist identified. So what I'm saying is the ALJ gave no reasons for rejecting her descriptions. Well, I'm sure you've read this and you tell us that the reasons aren't clear and convincing and there's no reasons, but I'm taking a look at this for the third time, and they're page after page after explanation by the ALJ as to why the ALJ concludes that she's just not disabled to the extent that she needs to be. I mean, it talks about her use of not seeing specialists, not using prescription pain relievers or anti-inflammatory medications, and then it chronicles she worked at a sorority house doing maintenance, a building supervisor. She plays golf, she leaves her house daily to shop or drive, she goes to the grocery store three to five times a week, plays cards, gardens, cooked and cared for herself, washed laundry, vacuums, takes out the trash, cared for a pet. I mean, the ALJ goes through all this and says the lifestyle evidence is just not consistent with the concept that she's so disabled that she's unable to work. So these reasons are pretty well set out, they seem to be clear, and they seem to be supported by substantial evidence. Your Honor, most of the things that you mentioned really focus on the physical side, and I agree with you. She could, at least before, at this point she can't work as a janitor, but she could for a long period of time, and you're right, she can cook and she can do all kinds of things, but mentally, the question is mentally. Well, in the next page, the claimant's mental disorders, while having more severe functional consequences than do her physical impairments, nevertheless are not so severe that they cannot be adequately accommodated by the limitations set forth in her residual functional capacity, and then he spends paragraphs going through with supporting evidence as to why he's arrived at that conclusion. I mean, isn't that clear, and isn't that also supported by evidence in the case? Well, Your Honor, in my brief You're asking us to re-decide the case, and we're an appellate court, and if there's evidence that supports reasons that are pretty clear, I mean, we're stuck with those. Your Honor, I don't think you are, and I think if you look at the Schneider v. Commissioner case, which was very similar in terms of how the court looked at very articulate lay evidence, that you could decide it differently, and also I'd like to say that all of the ALJ's conclusions flow from one assumption. He assumed that she was performing competitive work when she worked for the church, and I would submit that there is not any employer who would read Dr. Ettinger's, excuse me, Reverend Ettinger's description and hire Carol Pickett. It simply would not Dr. Hadley was a treating physician, is that right? That's true. She saw her for 32 times. Yeah, in her evaluations of April 2001, Dr. Hadley concluded that her ability to deal with even detailed instructions and extended concentration was no more than mildly impaired. Yes, Your Honor. In what? Well, she said that there were other things, her ability to respond appropriately to supervision, her ability to sustain a work environment. What Reverend, what the minister pointed out was that she built up so much resentment that for a period of time she couldn't work at the church because she couldn't bear to come in because she was so upset because people dirtied the church. It's not just a matter of how she responded to supervision, which was poor, but that she also responded badly to people causing dirt in the church. And, Your Honor, if you believe that that's an employable person, then I do lose the case, but I submit that the descriptions of Dr. Hadley and the minister really are not contradicted by any significant evidence. Dr. Wagner does not contradict. Dr. Hadley saw her for 32 times. There's really no mental contradiction here.  Thank you. Good morning, Your Honors. My name is Stephanie Martz and I'm here on behalf of Commissioner Barnhart. This is a case about the boundaries of substantial evidence review. Ms. Pickett is asking this Court to substitute her version and interpretation of the medical evidence and the Reverend's statement for the ALJ's interpretation of that same evidence, and that is not what substantial evidence review is. The ALJ's interpretation of that same evidence is a reasonable interpretation in light of the entire record, and under substantial evidence review, this Court must affirm that. Elaborate, especially on the mental problems. The mental problems. The ALJ acknowledged she had mental problems, and there is no question that she has these limitations, and the ALJ provided moderate limitations in these areas of dealing with supervisors, accepting instructions, being able to complete a work day or a work week without interruptions from psychologically based symptoms. These lists of moderate limitations that the ALJ provided were presented to a vocational expert, and the vocational expert testified that this was a job that tasks are outlined in advance. They're performed on a repetitive basis, day in and day out. The duties are the same, so there's minimal need for supervision. There's little to no co-worker involvement or little or rare interaction with the public, and therefore, based on this type of job where she's working independently, it doesn't change. She could do this work even with these moderate limitations. What the Reverend was talking about was this event that Ms. Tassinari just talked about, was this event when the Girl Scouts came in and she broke down. Well, obviously, this event with the Girl Scouts coming in wasn't a day-to-day kind of event. How the vocational expert described this janitor job as it's performed in the economy, it's more routine. The tasks, you know, every day you come in and you clean the bathrooms and you empty the trash, and it doesn't vary. What Ms. Pickett broke down in, which the Reverend described, was this unusual event. And even if that occurs on a, you know, having a moderate limitation here with that sort of problem, the vocational expert still said she could perform this job competitively. So while the Reverend may feel that it was impossible, the vocational expert who was an expert in vocational issues said it was not, and the ALJ reasonably relied on that expert's testimony. So what do we know about the performance on the job except on her last job in her work history? What I'm struck by is the fact that her mental condition is longstanding. It's lifelong. True. And the last employer is in effect telling the ALJ that she was not employable while she was at the church. That is what the Reverend said. And that whatever she did in the name of employment was really kind of a pretense in the sense that she was being accommodated in every way out of the attitude of the church. What about any prior employment? Was there ever a time in her lifetime when she was, you know, in an employment setting that was satisfactory? The only information we have is whether her employment was satisfactory or not is the Reverend's statement. And we don't know anything about the prior employment? No. She has, as Ms. Tassinari just stated, she has a very minimal employment history. Right. Doesn't that render somewhat suspect an answer to hypothetical questions? I guess it could. I mean, you know, there's a lot of plausible reasons why she isn't working, and there's no evidence that her mental impairments are the reason why she decided, you know, by the time she was 53 to only have five years of work. It's unknown to me. She's lived with her mother for pretty much her entire life other than this brief period where she didn't. Why that is, I don't know. Isn't it a fair inference? If you look at the record, isn't it a fair inference that the reason why she was living with her mother and not working was because she had all these problems? That's one inference. Another inference that I. . . I mean, the mother wasn't an heiress with tons of money piled around. No, but obviously the mother was supporting her and providing for her. Perhaps Ms. Pickett had no incentive to go work is another inference that could be made from this record. Well, but that's an inference that, again, is undercut by the evidence that suggests that she's unable to function in a workplace. That is the Reverend's statement in that. . . What she described, again, was the situation was the unusual situation where the Girl Scouts came in and she just had this breakdown because, you know, of this unusual event of using these facilities. What the vocational expert described was a job that is routine, repetitive, the tasks don't change. That's how he described the job of a janitor as it's generally performed. And he testified with moderate limitations of being unable to complete tasks and complete a normal work day or work week, even with a moderate limitation, which the ALJ acknowledged she does have, that that job could be performed. Do you have anything else, Counsel? No, I do not. Thank you very much. Would you like to respond? We'll give you a minute. Just to say that I don't believe motivation is a problem, and I think the record shows that, in fact, Carol Pickett was highly motivated to work. She turned benefits down previously. Your case, to the effect that she is currently disabled, is no better than a case that says she was always disabled. Isn't that true? That's probably true. Okay. Thank you, Counsel. The case just argued as ordered and submitted. We'll move on to Handelman v. The City of Portland.
judges: Leavy, Trott, Pollak